## <u>AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR SEARCH WARRANTS</u>

I, Special Agent Kyle D. Zavorotny, being first duly sworn, hereby depose and state as follows:

## <u>INTRODUCTION AND AGENT BACKGROUND</u>

1.      I make this affidavit in support of applications for warrants for searches of a residence, office and two vehicles, all located in the State of New Hampshire. The residence is located at 495 Pembroke Street, Pembroke, New Hampshire, and is the home of Stela Sacara, also known as Stela Thomas, and her minor child. The office is located at 530 Chestnut Street, Suite 1A, Manchester, New Hampshire, and is the office of Rochester Chemical LLC, a Delaware limited liability company operated by Sacara, and other companies she also operates. Both locations are further described in Attachments A. The vehicles are a 2010 Lexus, red in color, New Hampshire handicapped registration CH6537C, and a 2016 Kia Sorento, white in color, New Hampshire registration 4520217; both are registered to Stela Thomas, and will likely be located near one or both of the addresses described above.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been since June 16, 2002. I am currently assigned to the Bedford, New Hampshire Resident Agency of the Boston Division of the FBI. I investigate espionage-related criminal violations, including espionage, economic espionage, violations of export-control regulations, and other offenses, including violations of Title 18 criminal statutes, to include 18 U.S.C. §§ 371, 554 and 1001. I have received FBI training concerning these offenses and the investigation thereof.

3.      I am responsible for enforcing federal criminal statutes and am authorized to execute arrest and search warrants under the authority of the United States. During my tenure as a Special Agent, I have written and assisted in the writing of search warrant affidavits, and I have participated in the execution of numerous federal and state search warrants.

4.      The facts in this affidavit come from my personal observations, my training and experience, documents obtained through various legal processes, and information obtained from other

agents and witnesses. This affidavit is intended to show that there is sufficient probable cause for the requested warrants, but does not set forth all of my knowledge about this matter. Statements attributed to individuals are paraphrased unless otherwise noted.

5.      Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 554, 1001, 371 and the United States Export Administration Regulations have been committed by Stela Sacara, Rochester Chemical LLC, other companies controlled by Sacara, Natalia Sacara, also known as Natalia Bolocan, and others so far unidentified. There is also probable cause that evidence and/or instrumentalities of these crimes further described in Attachments B are located within the residence, office and vehicles described above and in Attachments A.

## PROBABLE CAUSE

6.      Stela Cornelievna Sacara (sometimes spelled Secara; referred to herein as Stela), also known as Stela Thomas, was born on or about October 10, 1986 in Moldova and is a citizen of that country. Stela currently resides at 495 Pembroke Street, Pembroke, New Hampshire, the residence described at Attachment A-1. Stela has attempted to gain United States citizenship; however, her attempts have been denied and she is currently the subject of deportation proceedings.

7.      Sergiu Companeet was born on or about November 2, 1982. Companeet was Stela's significant other and the father of Stela's minor child. Companeet previously resided with Stela at and owned the residence at 495 Pembroke Street. He now holds a California driver's license.

8.      Natalia Cornelievna Sacara (sometimes spelled Secara; referred to herein as Natalia), also known as Natalia Bolocan, was born on or about October 27, 1984, is a citizen of Moldova and is believed to reside there. Natalia is Stela's sister.

9.      Stela operates multiple companies from her home and the office located at 530 Chestnut Street, Suite 1A, Manchester, New Hampshire, the office described at Attachment A-2. The companies include, but are not limited to, Rochester Chemical LLC (which name appears on a sign outside the

office door), Newedge Technology LLC (also known as New Edge Technology LLC or New Edge

Research LLC), Cryotec LLC, Pharmakom LLC and Sublime Beauty LLC.

10. The FBI and the United States Department of Commerce's Office of Export

Enforcement (OEE) are conducting a joint criminal investigation regarding the activities of Stela,

Companeet, Natalia, the companies described above, and others associated with them.

11. On September 14, 2018, OEE Special Agent Courtney Rauch and I interviewed Stela in

her office at 530 Chestnut Street. At the initiation of the interview, SA Rauch displayed his credentials

and identified himself as a federal agent. I was introduced as a co-worker of SA Rauch. Stela was

advised that the agents were there to discuss the company's compliance with U.S. export laws and

regulations.

12. The office was primarily a single room containing two desks and a sofa and was full of

boxes, both sealed and opened, and some broken-down boxes. There was a storage area off the office

containing boxes.

13. There was no evidence seen in the office of the operation of any laboratory, research

facility, testing facility, or any business activity other than the receipt, re-packaging and shipment of

items.

14. Two individuals were present in the office, Stela and Companeet. Companeet claimed

that he only worked at the company "for food," moving boxes for Stela as she was then pregnant. Stela

agreed to speak with the agents about the nature of her business and specifically about exports by the

business. Companeet contributed very little to the interview.

15. Stela stated that she does accounting for Rochester Chemical, which she claimed was

based in Delaware. She stated the company's manager was named Amy Johnson, and that she believed

Johnson resided in Delaware. She stated she did not have contact information for Johnson on hand at

the time, but agreed to locate the contact information and e-mail it to SA Rauch. She stated that other

than Johnson and herself, the company would sometimes hire subject-matter experts to handle

questions for customers; however, she identified no other company employees.

16.     Stela stated that Rochester Chemical acquires consumable laboratory equipment such as bottles, vials, glassware, etc. for use in laboratories from various manufacturers, repackages them and ships them to purchasers. She stated that the only company to which Rochester Chemical exports goods is a German company called Riol-Chemie. She stated that Rochester Chemical ships items to Riol-Chemie "a couple of times a month." She did not claim that Rochester Chemical operates a laboratory, research facility or other testing facility.

17.     Stela initially stated that Rochester Chemical does not deal with hazardous items. After I noted that one of the boxes was visibly marked with hazard stickers, Stela stated that those items were only being shipped domestically, and that she meant that Rochester Chemical did not export hazardous items. She stated that those items and others in that part of the office were being shipped to New Edge Research in Wyoming.

18.     SA Rauch asked Stela about her knowledge of U.S. export-control laws, and her responses showed she was familiar with concepts such as embargoed countries, Export Control Classification Numbers (ECCNs), and the meaning of items being classified "EAR99." SA Rauch provided Stela with several U.S. Department of Commerce handouts on export controls.

19.     In the course of the investigation, agents obtained a national security letter for records of a Bank of America account belonging to Rochester Chemical LLC. According to these records, on April 20, 2015, a business banking account was opened at Bank of America's branch located at 620 Elm Street, Manchester, New Hampshire in the name of Rochester Chemical LLC. The documents to open the account were completed by Stela utilizing the name Stela Thomas. In these documents, Stela stated that Rochester Chemical is a limited liability company organized in Delaware and is classified for tax purposes as a single member sole proprietor LLC. The documents stated that Stela's title was "Managing Member."

20.     On January 14, 2019, SA Rauch and I again visited the office at 530 Chestnut Street,

and found only Companeet present. Companeet told the agents that Stela was not in the office, and had not been in the office since having their baby in November 2018. He stated that he came to the office to receive and send packages. Companeet was asked about Amy Johnson, and specifically whether Johnson exists. Companeet shrugged his shoulders and told the agents to ask Stela. He stated he had no information about the work at the business and he just does what Stela tells him to do.

21.     The same day, SA Rauch and I traveled to Stela's residence at 495 Pembroke Street. Stela permitted us into the residence. I advised Stela that I am an agent of the FBI and showed her my credentials; Stela also acknowledged that she remembered us from our previous interview. She advised us that her mother was visiting from overseas and was upstairs in the residence with her child; we did not see the mother or any other individual in the residence. She was asked about the contact information for Johnson she had previously stated she would provide, and she replied that she only had an e-mail address. I asked Stela whether Johnson truly exists, and showed her a copy of the Bank of America document in which she stated that she (Stela) was the sole member of the limited liability company. Stela stated she wished to speak with an attorney and declined to speak with us further. Stela was provided with my business card.

22.     As we were departing Stela's residence, we noted that a laptop computer was open in plain view on the kitchen island and was displaying a document including large bold letters reading "New Edge Research LLC."

23.     That evening at approximately 6:17 p.m., I received an e-mail sent to my FBI e-mail account from **accounting@rochesterchemical.com**, in which Stela stated that she had requested information about the company from "her superiors" and would provide the information when she received it.

24.     The following day, January 15, 2019, at approximately 2:48 p.m., I received a second e-mail from **accounting@rochesterchemical.com** which forwarded an e-mail from **radubolocan1971@gmail.com**. The sender of the forwarded e-mail identified himself/herself as Radu

Bolocan, and stated that he/she was the "current owner and director of the company" and a citizen of Romania. He/she stated that "Amy Johnson" was "Lanjewar Dulichand" located in India, and that he/she decided to use the name "Amy Johnson" since the true name was too hard to pronounce. He/she stated that Rochester Chemical exported its products to Germany, and he/she had requested "our German partner" to sign an end user certificate. Bolocan claimed that he/she does not speak English; however, the English in the e-mail was nearly perfect.

25.     On January 16, 2019 at approximately 12:05 p.m., I received a third e-mail from Stela at **accounting@rochesterchemical.com**, forwarding another e-mail from **radubolocan1971@gmail.com**. In this e-mail, Bolocan stated that he/she provided "export compliance documents" for shipments made since October 2018, but needed more time to provide information prior to that date. He/she also stated he/she does not "communicate directly with the end user, only through our German buyer…"

26.     The January 16, 2019 e-mail had four attachments. One of the attachments was a document titled "Export End Use Certification" which listed the "Purchaser" as Riol Chemie GMBH in Lilienthal, Germany, and the "End User/Ultimate Consignee" as Analiticheskie Tehnologii in Moscow, Russia. The form states that Riol Chemie "is an European supplier of scientific products to analytical testing laboratories in Europe."

27.     Records obtained from Bank of America show that Rochester Chemical received sizeable incoming wire deposits from foreign entities. The purposes listed for these wires included "chemical goods," "electronic equipment," and "laboratory equipment." In 2017 through November 2018, Rochester Chemical received wire deposits from Analytical Technologies totaling over $2 million. During the same period, Rochester Chemical did not receive any wire deposits from Riol-Chemie.

28.     Based on the above and other information, this court issued three search warrants in May 2019 for e-mail and online account information. These warrants were directed to Oath Holdings

Inc. for records pertaining to Stela's personal e-mail account, **stelase_cara@yahoo.com**; to Google, Inc. for records pertaining to the purported account of Radu Bolocan, **radubolocan1971@gmail.com**; and to GoDaddy, Inc. for records pertaining to the domains rochesterchemical.com and new-edge-research.com.

29.     The response received from Google showed that the **radubolocan1971@gmail.com** account was created on January 15, 2019, the day following the visit of SA Rauch and me to Stela's home and the day the first e-mail from that account was forwarded to me from Stela. The records show that the first login to the account, at the time the account was created, came from Internet Protocol (IP) address 75.69.157.4. A search of publicly available records at ultratools.com for that IP address indicates it belongs to Comcast Cable Communications Holdings, Inc., and the "Name" for the block of IP addresses it belongs to is "Boston-11."

30.     The Google response also shows that exactly two e-mails were sent from the account, both to **accounting@rochesterchemical.com**, both of which were forwarded to me as described above. No e-mails were sent to the account other than a "Welcome to Your New Google Account" message sent from Google upon the account creation.

31.     The Google response also provided the "Contacts" created for the account; the only contact created for the account was **accounting@rochesterchemical.com**.

32.     The response from GoDaddy for records of the domains rochesterchemical.com and new-edge-research.com includes tens of thousands of e-mails sent to and received by e-mail addresses created in those domains, predominantly **accounting@rochesterchemical.com** and **accounting@new-edge-research.com**. The records show that on January 15, 2019, the day the **radubolocan1971@gmail.com** account was created and sent its first e-mail, "Amy Johnson," utilizing **accounting@rochesterchemical.com**, sent at least two e-mails to chemical companies. These e-mails also originated from IP address 75.69.157.4, the same IP address used to create the **radubolocan1971@gmail.com** account.

33.     On January 16, 2019, the day the second e-mail was sent by

**radubolocan1971@gmail.com**, "Amy Johnson," utilizing **accounting@rochesterchemical.com** sent

at least five e-mails to chemical companies. The first two e-mails originated from IP address

75.69.157.4. The other three e-mails originated from IP address 64.222.235.2. A check of publicly

available records at ultratools.com found that this address belongs to Fairpoint Communications, 770

Elm Street, Manchester, New Hampshire.

34.     The GoDaddy response shows many e-mails over several years sent to and from an

accountant for the companies discussing tax issues. These e-mails indicate that the principals of the

company are Stela and her sister, Natalia Sacara, also known as Natalia Bolocan.

35.     A check of U.S. Government records of travelers entering the United States shows that

both Natalia and her and Stela's mother were in the country at the time the

**radubolocan1971@gmail.com** account was created and utilized.

36.     The same traveler records indicate that on or about February 18, 2014, Natalia entered

the United States and was sent for secondary screening. She was interviewed by a U.S. Customs agent,

and told the agent she is a "Ph.D. chemist."

37.     E-mails produced by GoDaddy show that about October 2018, Rochester Chemical

posted on a website seeking an employee to communicate with suppliers. The company ultimately

hired an individual named Pratik Lanjewar. No e-mails were found making any mention of

"Dulichand." It appears that the name provided by the **radubolocan1971@gmail.com** account for

"Amy Johnson," "Lanjewar Dulichand," was a combination of the name of a true employee and an

unknown or unrelated individual.

38.     Based on the above, there is probable cause to believe that the

**radubolocan1971@gmail.com** e-mail address and the two e-mails sent by the account and forwarded

to me were created by Stela and/or Natalia in efforts to deceive us and further impede our investigation.

39.     The GoDaddy return shows that New Edge Research operated in prior years from

addresses in Montana, while Stela resided there. It is believed that Stela moved to New Hampshire in 2015, and Rochester Chemical was created the same year.

40.     Stela stated that Rochester Chemical did not export hazardous items. However, the GoDaddy return includes a substantial number of e-mails contradicting this claim, including one as far back as November 13, 2013. This e-mail, from "Emily Patterson" at **accounting@new-edge-research.com**, had the subject line "hazmat shipping?" and was sent to a shipping company. The e-mail requests a quote for the cost of shipping five twenty-liter drums of an unknown substance to Germany. It provides a "UN number" of 3399 for the substance. An Internet search indicates that UN number 3399 is a code for "organometallic substance, liquid, water-reactive, flammable."

41.     Several e-mails also show that Amy Johnson is an alias used by Stela and/or Natalia. For example, in an e-mail from **accounting@rochesterchemical.com** to an accountant dated July 8, 2019, the sender states that a document generated by the accountant "says 495 Pembroke st, apt. 1A- I live in a house, there are no apartment here", and it bears a signature line from Amy Johnson. As stated above, Stela resides at 495 Pembroke Street, Pembroke, New Hampshire, and she and Natalia were corresponding with the accountant as the principals of the company.

42.     The Export Administration Regulations (EAR) require the reporting of certain information (Electronic Export Information (EEI)) to the United States Department of Commerce regarding the export of goods. Generally, the EAR requires the filing of EEI into the online Automated Export System (AES) prior to the export of items whenever the value of items of the same type included in the same shipment exceeds $2,500.

43.     Generally, the carrier conducting the export will file the EEI in the AES; the information in the filing is provided to the carrier by the shipper. For example, if a shipment is exported by Federal Express, Federal Express will request information regarding the contents, value, exporter and ultimate end user of the goods in the shipment from the shipper and provides that information in the EEI.

44.     The EAR requires that when a shipper authorizes the carrier to file the EEI on its behalf,

that the shipper provide accurate information and retain documentation to support the information provided (15 CFR § 30.3(c)(1)(ii)). These documents must be retained for a minimum of five years (15 CFR § 30.10(a)).

45.     The EAR states that the "EEI is a statement to the United States Government that the transaction occurred as described." (15 CFR § 758.1(a))

46.     The EAR provides significant criminal and civil penalties for knowingly submitting false or misleading export information through the AES, whether directly or indirectly. (15 CFR § 30.71(a)(1)).

47.     The warrant production shows hundreds of outgoing shipments of items by Rochester Chemical and New Edge Research. The vast majority of export shipments were sent to Riol-Chemie GMBH, Lilienthal, Germany.

48.     In an e-mail sent on April 25, 2019 from accounting@rochesterchemical.com to a freight forwarding company, "Amy Johnson" requests a quote to send products to "Germany, the same address as always." The freight forwarding company responded the same day with a quote for shipping to Lilienthal.

49.     In an e-mail sent on March 25, 2019 from accounting@rochesterchemical.com to a medical research laboratory, "Amy Johnson" stated that a "former research partner of ours" was seeking products and wanted to know how to proceed. "Johnson" names the former research partner as the Molecular and Radiation Biophysics Division of the Petersburg Nuclear Physics Institute in Russia. The research laboratory replies the following day that "they will have to order directly from us." On April 1, 2019, "Johnson" replies that "End user wishes to use our lab's billing address." In an e-mail sent on April 17, 2019 from accounting@rochesterchemical.com to a Federal Express office in Germany, "Amy Johnson" stated that "this shipment is received by a German party and afterwards goes to the end user outside the EU." The goods described are the same as those described in the exchange with the medical research laboratory.

50.     In an e-mail sent on June 24, 2015 from accounting@rochesterchemical.com to a company in Texas, "Amy Johnson" requested a quote for herbarium cabinets, and stated "Please include shipping to Manchester NH." The company replied "I'm assuming that these cabinets are ending up in Russia for a project". "Amy Johnson" replied "yes, that is correct. Are you working directly with the customer on this? If so, I apologize, they asked us to take care of this order." The company replied "I have been quoting this for over 2 years. … I have had many request to quote this. I'm not even sure who is really bidding this anymore." A quote is then provided totaling $58,950, including shipping to Germany.

51.     In an e-mail received on February 6, 2015 by accounting@new-edge-research.com from a biotechnology company possibly located in China addressed to "Emily," the marketing director stated "I just want to double confirm if the material you asked for is for a big company in Russia? We already have other distributor working with this client."

52.     In an e-mail received on January 10, 2017 by accounting@rochesterchemical.com from a biomedical company, an official of the company addressed "Amy" and stated "We shipped you an order … on October 31st, 2016. Can you tell me if this was then shipped to Russia, please? We have been contacted by a company in Russia, and I don't see that we ever shipped anything to them. It was the same lot number as the ones we shipped to you." "Amy Johnson" replied to this e-mail and stated "we have partnered with a lab in Germany … I am unaware of any other partners that could have been involved in this research. Please give a couple days to clear things up." The warrant response provided no further follow-up to this exchange.

53.     An e-mail was received on May 22, 2017 by info@rochesterchemical.com from a Russian customs agency. The e-mail was in Russian, but contained an attachment which is a scanned letter from "the vice-head of the customs of Pskov" presented in both Russian and English, addressed to Rochester Chemical. The English portion of the letter stated that the "customs of Pskov" is examining a $CO_2$ incubator and chemicals "supplied to Russia for … Analiticheskie Tekhnologii …

(Moscow, Russia) according to the contract … dated 24.09.2015, signed with your company."

54.      On or about July 27, 2016, accounting@rochesterchemical.com was added to the cc line

of a long string of e-mails. The string begins on June 2, 2016 with an e-mail from Stanislav Sobolev of

Chimmed Ltd., utilizing a Gmail account, to a Chinese company requesting a quote for pig isolators to

be delivered to Bremen, Germany. In response to a question from the Chinese company, Sobolev

provided the identity of the buyer as Chimmed Inc., Moscow, but the ship to location as Riol-Chemie,

Lilienthal, Germany. On July 5, 2016, Sobolev advised the Chinese company "We'll buy it through our

American partners. They will contact you soon." On August 1, 2016, the day after Rochester Chemical

was added to the e-mail chain, "Amy Johnson" e-mailed the Chinese company stating "PLEASE start

production for what we ordered, the client is ok and we need the products as soon as possible."

Additional e-mails in the warrant response show that "Amy Johnson" was already negotiating with the

same company for the purchase of pig isolators to be shipped to Bremen, Germany.

55.      On October 17, 2013, an e-mail was received by accounting@new-edge-research.com

from a reply.craigslist.org e-mail address. This e-mail appears to be from an individual responding to a

job posting placed on the Craigslist online advertising website. The subject line of the e-mail was "Re:

Part-time Russian worker" and the text of the e-mail asked "Do I really need to be Russian?" The

following day, "Emily Patterson" of New Edge Research LLC responded, stating "You have to be a

responsible and reliable person. … This job offer includes receiving packages and then forwarding

them to other addresses".

56.      A lengthy e-mail chain was produced in the search warrant return described above

which eventually included accounting@rochesterchemical.com. One of the early e-mails in the chain

was sent on April 1, 2016 from an individual using the name Alexandr Goltvyanitsa, representing

Chimmed of Moscow, Russia to a US manufacturer of silica gel packets. Goltvyanitsa expressed

interest in purchasing silica gel to be shipped to Riol-Chemie in Germany. After extensive back-and-

forth, on October 14, 2016, Goltvyanitsa stated "Riol-Chimie GmbH is our forwarder but they only

receive our goods and forward to us."

57.     In an e-mail received on November 15, 2016 by accounting@rochesterchemical.com

from a freight forwarding company, a company official addressed "Amy" and stated "We are putting

the B/L together for your silica gel packets shipment. We are only going to show Riol-Chemie on the

paperwork, and will not show the company in Moscow at all. Just want to confirm that this is ok for

your needs on this shipment?"

58.     An e-mail chain was produced in the search warrant return which eventually included

accounting@rochesterchemical.com. One of the e-mails in the chain was sent on October 17, 2016

from an individual using the name Aleksandr V. Yakovlev, representing the Laboratory of Solution

Chemistry of Advanced Materials & Technologies of ITMO University, St. Petersburg, Russia, to a US

manufacturer. Yakovlev expressed interest in purchasing cartridges, but stated as a state university, he

could not purchase directly, and wanted to purchase through a "local representative." On November 2,

2016, Yakovlev identified Rochester Chemical and "Amy Johnson" as the local representative.

59.     Several e-mails produced in the warrant return show a purchase of several items by

Rochester Chemical from a company in Montreal, Canada in 2017. On December 8, 2017, the sales and

marketing director for the Montreal company sent an e-mail to "Amy" at Rochester Chemical. The

relevant part of this e-mail stated:

> "Hi Amy,
>
> "I would like contact you regarding the purchase you made … . We have been informed
> by our local distributor in Russia that the system that was sold to Rochester Chemical
> has been acquired by a company in Russia. This company contacted our local distributor
> for support which has now created a conflict with our overseas contractual agreements.
> Please note that our systems are medical device instrumentations for intended use by
> health practitioners. They are strictly prohibited to be transferred to other countries due
> to a number of reasons including local Health Ministry directives of that country and tax
> evasions and Rochester Chemical an be held liable. What you did was not prohibited
> from our company and we need to resolve the situation. Please explain to us the
> situation so that we can better find a solution that will meet the end user needs and our
> distributor. I noticed that [an employee of the company] tried a number of times to find
> out the end user of the product with no response from your end. It was our
> understanding that the system will be used by Rochester Chemical and not be

transferred abroad."

On December 11, 2017, "Amy Johnson" replied that "Your email came as a shock to our team. We partnered with another lab for this purchase." She claimed to be attempting to contact the lab manager to resolve the situation, but was unable to reach him. No further explanation of the discrepancy was produced in the search warrant return.

60.     The end user of products being purchased by the companies here involved was not often identified in the e-mails produced in the search warrant return. However, when the end user was identified, it was claimed to be either Rochester Chemical or related entities themselves (which does not operate any known laboratory or research facility), Riol-Chemie, a Russian entity, or, in one case in 2014, a Ukrainian entity.

61.     Notably, although thousands of e-mails were produced in the search warrant return from GoDaddy from the e-mails associated with Rochester Chemical and New Edge Research, none of the e-mails show direct contact with any individuals at Riol-Chemie. Occasionally, an individual at Riol-Chemie was Carbon Copied (CCed) on e-mails to Federal Express or other shipping companies, but no communication regarding orders, payments, or any other issue was produced. The sole e-mail produced which was sent directly from a Riol-Chemie e-mail account to accounting@rochesterchemical.com appears to be an out-of-office response to an e-mail sent to Federal Express on which the Riol-Chemie e-mail account was CCed.

62.     Where the information provided by the shipper to the carrier is provided, the ultimate recipient of the shipment is usually given as Riol-Chemie. For example, in an Electronic Commercial Invoice prepared for a shipment sent about June 17, 2019, Federal Express Waybill # 7754 8998 9528, the shipper is given as Amy Johnson, 530 Chestnut St., Unit 1A, Manchester, NH 03101, US, and the consignee is given as Sergei Venger, Riol-Chemie GMBH, Gobelstrasse 21, Lilientha, DE. The "Country of Ultimate Destination" is also given as DE. DE is commonly used as an abbreviation for Germany.

63.     This Electronic Commercial Invoice also describes the items shipped as 26 pieces of "Lab. Reagent for Research," having a total value of $5000.

64.     The EEI filed for this shipment (X20190617759792) provides Riol-Chemie, Lilienthal, Germany, as the ultimate consignee.  It makes no mention of any other recipient of the products.

65.     In the course of this investigation, records were obtained from various financial institutions for accounts of entities associated with Stela. These records show that her companies have received wire transfers from many foreign entities, located in countries such as Russia, Estonia, Slovakia, the United Arab Emirates and the United Kingdom. Purposes listed for these transfers include "chemical goods," "electronic equipment" and "laboratory equipment." Not a single wire transfer was found which came from Riol-Chemie.

66.     On November 11, 2020, I conducted a Google search for Riol Chemie, and identified its website as riol-chemie,com. I viewed this website, and found it consists of a single page bearing the company's address, telephone number, and general e-mail address, and states (in German) "this page is being updated for you." I then utilized the publicly available Internet Archive (web.archive.org), a service which visits websites at intervals and records how they appeared on that date. I viewed the riol-chemie.com website as it appeared over time. When archived on January 10, 2016, the website appeared to represent a chemical supply company. However, upon its next archived date, March 12, 2016, the website was a generic page labeled "Web Server's Default Page," and states it is displayed because "there is no Web site at this address." The page remained this way (with one exception in which the site was completely unavailable) until it was archived on March 15, 2018, at which time it was changed to the way it appears today. This website activity is not consistent with the operation of a commercial chemical supplier.

67.     A federal grand jury subpoena was issued to Federal Express for records of shipments made from the Rochester Chemical office location in late June 2020. The response to this subpoena shows that shipments were still being sent from Rochester Chemical to Riol-Chemie as late as June 15,

2020.

68.     A check of EEIs filed on behalf of Rochester Chemical shows EEIs were filed for exports from Rochester Chemical to Riol-Chemie as recently as September 14, 2020.

69.     Over the time period of November 1, 2016 to November 11, 2020, 122 EEIs were filed documenting exports made by or on behalf of Rochester Chemical. Every EEI filed lists the Ultimate Consignee as Riol-Chemie.

70.     On October 6, 2020, I conducted surveillance at the Pembroke Street residential address of Stela. I initially passed by the residence at approximately 12 noon, and no vehicles were seen in the driveway. Upon making a second pass by the residence at approximately 12:02 p.m., Stela's white Kia Sedona, New Hampshire registration 4520217, was observed parked in the driveway.

71.     At approximately 12:25 p.m. on the same date, I observed Stela's red Lexus, New Hampshire registration CH6537C, parked outside the Chestnut Street office address of Rochester Chemical. At about 12:26 p.m., I observed the Lexus backing out of the parking space. The vehicle was occupied only by the driver, and although I did not see the driver well enough to identify, it was a male. I followed the vehicle, which took a logical route directly towards the Pembroke residence. I discontinued the surveillance when the vehicle was approximately one mile from the residence.

72.     Although I did not see Stela on this date, I believe she was likely at her residence as of 12:02 p.m., as a male was seen a short time later driving her Lexus, and her Kia arrived at the residence just prior to that time.

73.     On October 8, 2020, I conducted surveillance at the Chestnut Street office address of Rochester Chemical. At approximately 12 noon, the above-described Lexus, registered to Stela, was observed parked and unoccupied outside the building. At about 12:15 p.m., an unidentified male exited the building, placed boxes into a recycling bin outside the building, and went back into the building. At approximately 12:25 p.m., the same male exited the building, placed a black trash bag into a trash bin outside the building, entered the driver's seat of Stela's vehicle and drove away. I retrieved some of the

recycling and trash deposited by the male; one box placed in the recycling bin was a Federal Express box addressed to Rochester Chemical, sent by a likely chemical company, the trash bag contained a large amount of Styrofoam packing material. I did not see Stela nor her other vehicle.

74.     On October 22, 2020, I conducted surveillance at the Chestnut Street office building. At approximately 11:45 a.m., Stela's red Lexus was parked and unoccupied beside the building. At about 12 noon, the same unknown white male exited the building, entered the driver's seat of the Lexus, and drove away. I did not see Stela nor her other vehicle.

75.     On November 6, 2020, I conducted surveillance at the Chestnut Street office building. At approximately 12:15 p.m., Stela's red Lexus was parked and unoccupied beside the building. At about 12:20 p.m., Stela exited the building, entered the driver's seat of the Lexus, and drove away.

76.     On November 9, 2020, I conducted surveillance at the Chestnut Street office building. At about 9:42 a.m., Stela's red Lexus arrived at the office building. Stela exited the vehicle, smoked a cigarette, and entered the building.

77.     Based on the above, there is probable cause to believe that Stela is operating Rochester Chemical LLC, New Edge Research LLC and other companies from her residence at times while the unknown male resides with her, drives her Lexus, and travels to the office to receive packages for the companies.

78.     Based on the above, there is probable cause to believe that Stela, Natalia, Rochester Chemical LLC, New Edge Research LLC and others are acquiring goods on behalf of end users located in Russia but shipping the items through Riol-Chemie located in Germany.

79.     Based on the above, there is also probable cause to believe that the same individuals and companies are intentionally submitting or causing false EEI to be submitted by the freight forwarders and shipping companies to the U.S. Government, in violation of 18 U.S.C. §§ 554, 1001 and the EAR.

80.     Based on my training and experience, I know that entities in foreign countries will sometimes disguise the true end users of products acquired from the United States to prevent or impede

the ability of the United States Government to determine the activities of these end users. In many

instances, the end users being disguised are or are affiliated with the military or other agencies of the

governments of the countries in which these end users are located.

81.     Very few e-mails were produced in the search warrant return described above showing

communications between Stela, Natalia, Rochester Chemical or other involved entities and individuals

in Russia or Germany. However, the return shows hundreds of purchases and shipments. The operation

of such an extensive operation requires extensive communications. It is likely that such

communications occur either utilizing other e-mail addresses, by text message, by telephone, or by

other method such as social media applications. Evidence of these communications will be found on

computers and/or cellular telephones utilized by Stela and/or in hard copy format at her residence or

office, or in her vehicle(s).

82.     Based on the above, there is probable cause to believe that additional evidence showing

violations of 18 U.S.C. §§ 554, 1001, 371 and the Export Administration Regulations are located at the

addresses or in the vehicles described in Attachments A.

83.     Based on my training and experience, I know that computer hardware, software,

documentation, passwords, and data security devices may be important to a criminal investigation

in two distinct respects: (1) the items themselves may be instrumentalities, fruits, and/or evidence of

crime; and/or (2) items may have been used to collect and store information about crimes (in the form

of electronic data). Thus, Rule 41 of the Federal Rules of Criminal Procedure permits the government

to search and seize computer hardware, software, documentation, passwords, and data security devices

which are: (1) instrumentalities, fruits and/or evidence of crime; and/or (2) storage devices for

information about crimes.

84.     Based on my training and experience, I know that searching and seizing information

from computers often requires agents to seize most of or all electronic storage devices (along with

related peripherals) to be searched later by a qualified computer expert in a laboratory or other

controlled environment. This is true because of the following:

a.  Computer storage devices can store the equivalent of thousands of pages of information. Additionally, a suspect may try to conceal evidence; he or she might also store it in random order with deceptive file names. This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and often it would be impractical to attempt this kind of search on site.

b.  Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. For example, on site and laboratory analysis by a qualified computer specialist is often required in order to properly retrieve and analyze electronically stored (computer) data, document and authenticate the data, and prevent the loss of the data either from accidental or deliberate programmed destruction. In many cases, the evidentiary data can be backed up to government owned computer data storage devices at the site of the search. However, there are circumstances that may necessitate the seizure and removal of the entire computer system and peripheral devices to a secure laboratory setting on order to analyze and extract the evidence. To effect accurate and complete analysis may require seizure of all computer equipment and peripherals which may be interdependent, the software to operate the computer system, data security devices (including passwords) and related instruction manuals which contain directions concerning the operation of the computer system and software programs. This is true because the peripheral devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output devices in order to

read the data on the system. It is important that the computer expert be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence. In addition, the computer expert needs the relevant system software (operating systems, interfaces, and hardware drivers) and any application software which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices.

85.     Based on the above facts and circumstances and information, permission is requested to seize all computer systems and peripherals if necessary even though there may be unrelated information stored on the computer system(s). This unrelated data will not be used and will be separated (to the extent possible) from the evidentiary data and preserved.

86.     Based on my training and experience, I know that certain computer devices, such as "smart" phones, tablets, laptop and notebook computers, and desktop computers, can be secured by hardware and software which require the placing of the user's finger and/or thumb on a fingerprint reader on the device; the placing of the face of the user in front of the device and activating a facial recognition application on the device; or the placing of the eyes of the user in front of the device and activating an iris recognition application on the device to "unlock" the device. Failure to unlock the device may render the data on the device to be seized pursuant to this warrant inaccessible to investigators. Therefore, permission is requested to place Stela's finger and/or thumb on the fingerprint reader of any device found on her person or within the residence, office or vehicles to be searched which is reasonably believed to belong to Stela; to hold any such device in front of the face of Stela and activate a facial recognition application; or to hold any such device in front of Stela's eyes and activate an iris recognition application.

Respectfully submitted

/s/ Kyle Zavorotny
Kyle Zavorotny
Special Agent
Federal Bureau of Investigation

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Date: November 13, 2020
Time: 3:08 PM, Nov 13, 2020

Andrea K. Johnstone,
United States Magistrate Judge

## ATTACHMENT A-3

## VEHICLE TO BE SEARCHED

### 2010 LEXUS, CH6537C

A 2010 Lexus, red in color, New Hampshire handicapped registration CH6537C, registered to Stela Thomas. It is expected to be located near her residence, 495 Pembroke Street, Pembroke, New Hampshire, or her office address, 530 Chestnut Street, Manchester, New Hampshire.

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

1.  Any documents regarding the export of items from the United States.

2.  Any documents pertaining to Rochester Chemical LLC, New Edge Research LLC, Newedge Research LLC, New Edge Technology LLC, Cryotec LLC, and/or any other business owned and/or operated by Stela Thomas/Sacara.

3.  Any documents pertaining to payments made or received for items to be exported.

4.  Any documents pertaining to United States export control laws or regulations.

5.  Any documents pertaining to Riol-Chemie GmBH, Analiticheskie Tehnologii/Analytical Technologies, and/or any business located in Russia.

6.  Any computer or electronic media that were or may have been used as a means to commit the offenses described on the warrant, including violations of Title 18, United States Code, §§ 371, 554 and 1001, and the Export Administration Regulations.

7.  For any computer, computer hard drive, "smartphone," or other physical object upon which electronic data can be recorded (hereinafter referred to as a "computer") that is called for by this warrant, or that might contain things otherwise called for by this warrant:

> a.  Evidence of who used, owned, or controlled the computer at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;
>
> b.  Evidence of software that would allow others to control the computer, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c.   Evidence of the lack of such malicious software;

    d.   Evidence of the attachment to the computer of other storage devices or similar containers for electronic evidence;

    e.   Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the computer;

    f.   Evidence of the times the computer was used;

    g.   Passwords, encryption keys, and other access devices that may be necessary to access the computer;

    h.   Documentation and manuals that may be necessary to access the computer or to conduct a forensic examination of the computer;

    i.   Contextual information necessary to understand the evidence described in this attachment.

8. Records and things evidencing the use of the Internet, including, but not limited to, routers, modems, and network equipment used to connect computers to the Internet, records of Internet Protocol addresses used, records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

9. During the execution of the search of the properties described in Attachment A, and with respect to (1) any device on Stela Sacara's person, or (2) any device at/on the properties reasonably believed to be owned, used, or accessed by Stela Sacara, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of Stela Sacara to the fingerprint scanner of the seized device(s); (2) hold the seized device(s) in front of the face of Stela Sacara and activate the facial recognition feature; and/or (3) hold the seized device(s) in front of the face of Stela

Sacara and activate the iris recognition feature, for the purpose of attempting to
unlock the device(s) in order to search the contents as authorized by this warrant.

10. As used above, the terms "records" and "information" include all of the foregoing
items of evidence in whatever form and by whatever means they may have been
created or stored, including any form of computer or electronic storage (such as hard
disks or other media that can store data); and handmade form (such as writing,
drawing, painting); any mechanical form (such as printing or typing); and any
photographic form (such as microfilm, microfiche, prints, slides, negatives,
videotapes, motion pictures, or photocopies).

11. As used above, the term "computer" includes but is not limited to any and all
computer equipment, including any electronic devices that are capable of collecting,
analyzing, creating, displaying, converting, storing, concealing, or transmitting
electronic, magnetic, optical, or similar computer impulses or data. These devices
include but are not limited to any data-processing hardware (such as central
processing units, memory typewriters, mobile "smart" telephones, tablets, and self-
contained "laptop" or "notebook" computers); internal and peripheral storage
devices (such as fixed disks, external hard disks, floppy disk drives and diskettes,
thumb drives, flash drives, Micro SD cards, SD cards, CDs, DVDs, tape drives and
tapes, optical storage devices, zip drives and zip disk media, and other memory
storage devices); peripheral input/output devices (such as keyboards, printers, fax
machines, digital cameras, scanners, plotters, video display monitors, and optical
readers); and related communications devices (such as modems, routers, cables and
connections, recording equipment, RAM and ROM units, acoustic couplers,
automatic dialers, speed dialers, programmable telephone dialing or signaling
devices, and electronic tone-generating devices); as well as any devices,

mechanisms, or parts that can be used to restrict access to such hardware (such as physical keys and locks).